# United States District Court
## for the
## Western District of New York

United States of America

v.

JENNIFER MILLER,

*Defendant*

Case No. 14-MJ-561

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the April 2013, in the County of Monroe, in the Western District of New York, the defendant violated Title 18, United States Code, Sections 1591 and 2423(a), said offenses described as follows:

the defendant, in or affecting interstate or foreign commerce, knowingly recruited, enticed, harbored, transported, provided and obtained a person, knowing and in reckless disregard of the fact that the person had not attained the age of 18 years and would be caused to engage in a commercial sex act, in violation of Title 18, United States Code, Section 1591; **and** the defendant did knowingly transport in interstate commerce an individual who had not attained the age of 18 years, with the intent that such individual engage in sexual activity for which any person can be charged with a criminal offense, in violation of Title 18, United States Code, Section 2423(a).

This Criminal Complaint is based on these facts:
☒ Continued on the attached sheet.

*Complainant's signature*

BRIAN K. TUCKER,
TASK FORCE OFFICER
FEDERAL BUREAU OF INVESTIGATION
*Printed name and title*

Sworn to before me and signed in my presence.

Date: March 3, 2014

*Judge's signature*

HONORABLE JONATHAN W. FELDMAN
UNITED STATES MAGISTRATE JUDGE
*Printed name and title*

City and State:   Rochester, New York

# AFFIDAVIT IN SUPPORT OF A CRIMINAL COMPLAINT

STATE OF NEW YORK )
COUNTY OF MONROE ) ss:
CITY OF ROCHESTER )

I, Brian K. Tucker, being duly sworn, deposes and says:

## I. INTRODUCTION

1. I am a Task Force Officer with the Federal Bureau of Investigation (FBI), and as such, am a sworn federal law enforcement officer. I have been a Task Force Officer for 3 years and a Police Officer for the previous 29 years.

2. I am currently assigned to the Buffalo Division, Rochester, New York, Resident Agency. My duties involve investigating federal crimes including violations of Title 18, United States Code, Sections 1591 and 2423(a). I have received a large amount of training over the years related to conducting criminal investigations, to include child exploitation and sex trafficking investigations, and have investigated several Section 1591 investigations.

3. The information contained in this affidavit is based upon my personal knowledge and observations, my training and experience, conversations with other law enforcement officers and witnesses. This affidavit is submitted for the limited purpose of establishing probable cause to believe that JENNIFER MILLER, date of birth xx/xx/1988,

while in the Western District of New York, in or affecting interstate or foreign commerce, knowingly recruited, enticed, harbored, transported, provided and obtained a person who had not attained the age of 18 years and would be caused to engage in a commercial sex act., and knowingly transported an individual who has not attained the age of 18 in interstate commerce, with intent that the individual engage in prostitution, in violation of Title 18, United States Code, Sections 1591 and 2423(a).

4. Because this affidavit is being submitted for the limited purpose of establishing criminal complaint, I have not included every detail of every aspect of the investigation. Rather, I have set forth only those facts that I believe are necessary to establish probable cause that JENNIFER MILLER did knowingly violate Title 18, United States Code, Sections 1591 and 2423(a). Unless specifically indicated, all conversations and statements described in this affidavit are related in substance and in part.

## II. BACKGROUND OF INVESTIGATION

5. On May 5, 2013, Rochester Police Department (RPD) Officer Eric McGraw responded and spoke with Cooperating Witness #1 (CW1), a resident of Rochester, New York, who provided information that her daughter, Cooperating Witness #2 (CW2), age 16, date of birth, xx/xx/1996, was being prostituted under the name CHERRY RED 20 in Williamsport, Pennsylvania. The information provided indicated that CW2 was possibly with Jodia Campbell, of Cooper Road, Rochester, New York.

6. On May 6, 2013, TFO Brian Tucker and Special Agent Barry Couch interviewed CW1. CW1 was shown a copy of an escort advertisement from Backpage.com and confirmed that it was the advertisement that she had seen for her daughter. The photo was not CW2, but the phone number listed in the advertisement was being used by CW2 and CW2 answered that phone when CW1 called the number listed on the advertisement over the previous weekend. Backpage.com is an internet advertising website accessible throughout many States in the United States, including New York, and accessible in certain foreign countries as well.

7. CW1 stated that CW2 had been a runaway since April 2, 2013, and had been picked up by the RPD for a PINS warrant earlier that day, prior to TFO Tucker and SA Couch arriving to speak with CW1. CW1 also said she had received information CW2 had been involved in prostituting on the internet for at least a couple of weeks. CW1 said she received a call from Jodia Campbell telling her JENNIFER MILLER had taken CW2 to Elmira, New York, and Williamsport, Pennsylvania, to work as a prostitute. CW1 learned CW2 had also traveled to New York City to prostitute with Campbell, MILLER and another female, Teala Henry. CW1 said she made contact with MILLER, Campbell and Henry and told them to leave CW2 alone and not to prostitute her again.

8. CW1 knows MILLER, Campbell and Henry, saying that Campbell is the ex-partner of CW1's brother. CW1 said that Campbell's cell phone number is 585-XXX-2526. CW1 also said that MILLER is her niece and MILLER's cell phone number is 585-XXX-

3

9151. CW1 knows MILLER to live in the multi-colored high rise apartment building on Mt. Hope Avenue next to the river near downtown Rochester. CW1 said that Henry is a cousin of CW1 and that Henry's phone number is 585-XXX-1832. CW1 also knew Campbell to prostitute in the past and to be a pimp that traveled on weekends to engage in prostitution activity. CW1 also knew MILLER to be pimped as a prostitute by a guy named "L.A." who she believed was named "Laree".

9. CW1 said the weekend prior to May 6, 2013, MILLER called CW1 and told her that Campbell had taken CW2 to Williamsport, Pennsylvania, to prostitute under the name "CHERRY RED" and CW1 was able to confirm that advertisement in the WILLIAMSPORT section of Backpage.com. CW1 communicated with and was able to convince CW2 to come home. Once home, CW2 confirmed to CW1 she had been prostituting in Williamsport, Pennsylvania, that past weekend.

10. On May 6, 2013, CW1 did conduct one party consent phone calls with both MILLER and Campbell. During those calls, Campbell confirmed she let MILLER travel with her to New Jersey with the understanding MILLER would pay for half of Campbell's room. She also confirmed that she had a traffic accident on Jones Road, in New Jersey. Campbell also claimed she did not learn of CW2 being prostituted until two days after they arrived in New Jersey. In the call with MILLER, MILLER talked about how it was her plan for her and Henry to go down and they would not have done this with CW2, because they would go down as promoters. MILLER also confirmed they had two hotel rooms there and

4

one was in her name. MILLER also confirmed she knew CW2 to be 16. MILLER also said CW2 had previously told MILLER she was prostituting and giving half her money to a pimp. MILLER also claimed she got a text message from CW2 claiming she needed $300 or she would blame MILLER for the prostitution.

11. On May 15, 2013, SA Couch and TFO Tucker interviewed CW2 at the Westfall Road Children's Shelter in Rochester, New York. CW2's attorney, Lisa Mislow, was present as well. After being informed of the identities of SA Couch and TFO Tucker, CW2 provided the following information.

12. CW2 said she ended up "hooking up" with JENNIFER MILLER, her mom's niece, who was a friend of the person CW2 was staying with. CW2 knew MILLER was "like a Madam", taking girls to prostitute. MILLER told CW2 she "might as well come work for me". CW2 told MILLER she would think about it. CW2 said MILLER was prostituting with "L.A.". MILLER told CW2, "the offer is always there", and said they were going to go to New York City, Pennsylvania, and North Carolina. MILLER told her she would make $900 a night.

13. According to CW2, around April 7 or 8, 2013, CW2 went with MILLER and Henry to Secaucus, New Jersey, and Campbell drove them in her Lexus. Campbell's baby's father also made the trip. According to CW2, the hotel rooms were put in Campbell's name at MILLER'S request. Possibly at the "Best Stay America." At that time, CW2 said

5

MILLER started posting advertisements on Backpage.com from MILLER'S phone. MILLER would use fake pictures to put on the ads. CW2 watched MILLER post the ads "a lot". MILLER would ask Tealla Henry what name she (Henry) wanted to go by and Henry she came up with names like, "Red" and "Trina". MILLER started to teach CW2 and how to answer the phones when customers would call in. Henry already knew how to talk to customers. MILLER would take Campbell's car for Henry's outcalls. MILLER came back from an outcall with Henry and told CW2, "your turn". MILLER would post the advertisements for two girls and would advertise CW2 as a "first timer", that she was new to the city, and only in town for a couple of days. The advertisements were posted in Secaucus, New Jersey.

14. "L.A." had given MILLER a phone for CW2 to use as a work phone for the prostitution activity. CW2 remembered the number to be 818-XXX-5886. CW2 also knew that "L.A." and MILLER also used a phone with number 585-XXX-3870 to post Backpage advertisements. CW2 remembered that MILLER'S phone number started with "512".

15. CW2 prostituted in Secaucus that night and had four or five dates. CW2 recalled it was $150 for a half hour and $200 for an hour. CW2 made $800 that night by herself and had sexual intercourse with the dates. The dates were all incalls because MILLER wanted it that way, because CW2 was sixteen years old. MILLER was in the bathroom while CW2 had the dates with the guys. Henry was with CW2 during the dates

and on some of them, Henry participated with CW2 prostituting together. MILLER did not prostitute and would just have CW2 and Henry prostitute.

16. While still in New Jersey, Campbell's car got wrecked in an accident, close to a Holiday Inn. MILLER walked away from the accident because she did not want to get into trouble.

17. According to CW2, they stayed in New Jersey for a few more days at the Holiday Inn and CW2 and Henry continued to prostitute. CW2 had approximately two to three more dates and Henry had approximately four to five more. The advertisements for the prostitution were on Backpage. All of the money CW2 earned prostituting was taken by MILLER, even though it was supposed to be split up. CW2 believed some of the money was going to be used to pay the insurance deductible for Campbell's car wreck. CW2 decided she did not want to prostitute anymore. However, MILLER told CW2 she was going to take CW2 to Pennsylvania. Campbell and MILLER drove CW2 to Williamsport, Pennsylvania, where MILLER left CW2 there alone at the Holiday Inn Express by the Weis store. CW2 remembered she had to take the elevator up to her room, but could not remember the room number. While in Williamsport, CW2 used a phone she had been given with the 818-XXX-5886 number. MILLER, even though she was not there physically with CW2, would post Backpage advertisements for CW2 from MILLER'S phone. CW2 did have dates, but stayed there only one day and was picked up by MILLER and taken back to

7

Rochester where MILLER gave CW2 $150 even though CW2 had earned over $1000 prostituting.

18. CW2 said that she and another girl both decided to go back to Williamsport. MILLER and "L.A." transported and dropped the girls off at the same Holiday Inn Express. They drove in MILLER's car, a gray, four-door car that was in decent condition. MILLER paid for the room for the girls. CW2 advised that MILLER would sometimes pay cash and sometimes pay for rooms with a Vanilla card, so she could not be tracked. MILLER would sometimes use her personal credit card too. MILLER would show her real ID at hotels when checking in. When MILLER left the girls there, she gave CW2 MILLER'S ID and told CW2 that if she was caught, to say that CW2 had taken MILLER's ID and that she wanted to make the money.

19. MILLER would always post the advertisements for CW2. CW2 said she did not know how to post them. Both CW2 and her friend had prostitution dates in Williamsport. CW2 said the calls came on her friend's phone. CW2 said that her friend's phone number would be in the phone that TFO Tucker had gotten from CW2's mother. CW2 and her friend earned approximately $1500 or $1600 prostituting that time. CW2 and her friend ended up hiding $100 each from MILLER, knowing she would take it all. MILLER ended up giving CW2 $250 and her friend $150. MILLER supplied a box of condoms and food for the girls while they were in Williamsport. CW2 said that some of the prostitution dates would try to do things with her that she did not want them to, but

8

MILLER told her it was for the customers' service. MILLER also told them to give oral sex. MILLER tried to get the other girl to do anal sex as well.

20. According to CW2, MILLER lives on Mt Hope Avenue in Rochester, New York, in "The Hamilton", the tower with the different-colored panels on it.

21. CW2 never saw any of the Backpage advertisements for her, but knew that MILLER was using her phone to place the advertisements, because CW2 had seen MILLER using MILLER's phone knowing she was placing the ads and CW2 had seen the "Backpage.com" website on MILLER'S phone. CW2 described MILLER'S phone as a big phone that was like a mini Ipad with a black cover.

22. Subpoena returns from the Extended Stay America in Secaucus New Jersey, and the Holiday Inn in Fort Lee, New Jersey, showed rooms under the names Jodia Campbell and JENNIFER MILLER. TFO Tucker spoke with Progressive Insurance and confirmed that a car accident took place with Campbell's Lexus in Fort Lee, New Jersey, in April, 2013. This accident report was approximately one block from a Holiday Inn.

23. TFO TUCKER also obtained a subpoena for reviewed records from Backpage.com and found multiple Backpage ads for prostitution, related to this investigation, in Fort Lee, New Jersey, between April 13 and 14, 2013. Some of these ads listed two girls specials. These ads listed contact phone numbers assigned to JENNIFER

9

MILLER, Jodia Campbell and Tealla Henry. This was determined based on interviews and phone records and investigation. The account administrative data on these ads listed another phone, which was registered to JENNIFER MILLER and the recent name on the data was "Laree". TFO Tucker was also able to confirm, via subpoena, that many related ads on this account were placed for escort services from, Secaucus and Fort Lee, New Jersey, Watertown, Ithaca and Elmira, New York, and Williamsport, Pennsylvania. These ads matched dates and times as they relate to CW2's account. These related ads also show numbers for MILLER, Henry and Campbell. These ads also coincide to phone numbers provided by CW2. Some of the administrative data records for these ads also list MILLER and her address at "185 Mt. Hope Ave" as well as "LAREE" and his address of 11 St. Jacobs Street, and "TEELA".

24.   A review of police records by TFO Tucker show MILLER lists her address as 185 Mt Hope Apt XXX in August 2011 and again on March 11, 2013.

25.   On August 6, 2013 TFO Tucker and SA Couch conducted a non-custodial interview with JENNIFER MILLER at her place of employment. MILLER confirmed her phone was used for the prostitution of CW2. MILLER confirmed Greggs pimps girls. MILLER confirmed that Henry was in New Jersey and prostituted with CW2. MILLER also confirmed that she helped post ads for prostitution at the request of Greggs for him in Elmira, New York. She was also shown the Backpage ads and confirmed that it was the ad she posted. MILLER also stated Greggs has a cell phone, but he got the service in her name.

MILLER confirmed the e-mail address, GTHOUSANDK@GMAIL.COM belongs to "L.A.", who she identified as Laree Greggs. MILLER also confirmed that the e-mail address JENMILLER231@GMAIL.COM is her account. MILLER also confirmed Greggs used her car to drive two other females, (herein forward described as CW3 and CW4), to Elmira for prostitution purposes while MILLER was in New Jersey. MILLER also claimed on a trip separate from the one to New Jersey, she and Greggs transported CW2 and CW3 to Williamsport, Pennsylvania, and put them in a hotel room to work as prostitutes. MILLER also said that Greggs taught her how to post on Backpage, but after she learned she posted for him because he was out of money at the time.

26. SA Couch asked MILLER if she knew that posting ads for CW2 and CW3 was wrong because they were underage. MILLER responded by saying, "I know it's wrong and the consequences for doing it. Just don't think that far ahead".

27. On August 6, 2013, TFO Tucker and SA Couch met with and interviewed Tealla Henry, this was a non-custodial interview. Henry confirmed that she and CW2 prostituted in New Jersey willingly. Henry also confirmed that she knew CW2 was underage. Henry confirmed Backpage ads, she was shown for Fort Lee, New Jersey, were for her and CW2 and they contained her phone number. The ads were place on an account Henry shared with MILLER and "L.A.". Henry also confirmed that MILLER posted ads for both CW2 and Henry, but only took Henry on outcall dates, using Campbell's car.

11

28. On August 6, 2013, TFO Tucker and SA Couch did meet with and interview Jodia Campbell, at 728 Brown Street. This was a non-custodial interview. Campbell confirmed the trip to New Jersey and knew that the girls' prostituted while there. Campbell also said that MILLER gave her money to help repair her car and that the money, which was obtained from prostitution, came from CW2 and Henry, $250 each. Campbell said she thought CW3 and CW4 where going to be traveling with her, then MILLER changed it to CW2 and Henry. Campbell claimed she let CW2 use her phone for the ad and Campbell claimed she did not prostitute herself. Campbell also confirmed that she drove Henry to a date and let MILLER use her car to drive Henry to a date. Campbell also stated she was aware CW2 had several dates while in New Jersey and CW3 and CW4 were with "L.A." in Elmira, New York.

29. On October 1, 2013, TFO Tucker and SA Couch were able to meet with and interview CW3, age 18 date of birth xx/xx/1995. CW3 confirmed she was only 17 at the time of this incident. CW3 also said that MILLER had suggested to her that she prostitute while they lived together. CW3 felt that MILLER and "L.A." were working together in the prostitution ring. CW3 confirmed that MILLER took CW2 and CW3 to Williamsport, Pennsylvania, for the purpose of prostitution. CW3 also said while in the Williamsport, Pennsylvania, Holiday Inn, she made between one to two thousand dollars and turned the money over to MILLER. CW3 also made a confirmatory identification of MILLER. CW3 confirmed she prostituted two times with MILLER.

30. On January 28, 2014, SA Couch and TFO Tucker met with and interviewed Laree Greggs at his home located at XX St. Jacobs St, Rochester, New York. Greggs confirmed the scenario that CW2 had traveled to New Jersey to prostitute with MILLER, Campbell and Henry. Greggs said he traveled to Elmira with CW3 and CW4 for the same purpose. Greggs said that after he learned of CW2's age he wanted nothing to do with her and he told MILLER she should not be involved. Greggs confirmed he drove the girls in MILLER'S car, but said he got drunk and high on purpose so that he would not have be involved in their prostitution. Greggs said that he felt they looked young. Greggs confirmed giving the girls alcohol.

31. Greggs confirmed that the Backpage account used for the prostitution was his and claimed that MILLER must have hijacked the account to use it. Greggs also confirmed that MILLER learned about prostitution from him, but it was for adult girls. Greggs was asked about prostituting girls and he said he was a laborer, but prostituting girls was convenient.

32. Greggs also confirmed that he traveled with MILLER to take CW2 and CW3 to Williamsport, Pennsylvania, to drop them off for the purpose of prostitution, but he did not stay there and rode back with MILLER after they dropped the girls off.

13

33. Greggs also confirmed that he had a phone conversation with CW2 about prostitution and he thought it was too good to be true, until he asked her age and learned that she was fifteen or sixteen, then he wanted nothing to do with it and he gave the phone to MILLER who continued to talk to CW2 about it.

34. Greggs also confirmed that he was in Williamsport, Pennsylvania, the weekend that CW2 was found to be down there by her mother. Greggs said he was not part of her being prostituted that weekend, claiming he was there with other girls. Greggs also confirmed that he talked to MILLER about the prostitution of the young girls and that it was serious.

## CONCLUSION

Based upon the forgoing, your affiant respectfully submits that there is probable cause to believe that JENNIFER MILLER has violated Title 18, United States Code, Sections 1591 and 2423(a), in or affecting interstate or foreign commerce, knowingly recruited, enticed, harbored, transported, provided and obtained a person who had not attained the age of 18 years and would be causes to engage in a commercial sex act and knowingly transporting an individual who has not attainted the age of 18 years in interstate

or foreign commerce, with intent that the individual engage in prostitution, or any sexual activity for which any person can be charged with a criminal offense.

_____
Brian K. Tucker
Task Force Officer
Federal Bureau of Investigation

Subscribed to and sworn before me
this _____ day of ~~March~~ April, 2014.

_____
HONORABLE JONATHAN W. FELDMAN
UNITED STATES MAGISTRATE JUDGE